```
 1                UNITED STATES DISTRICT COURT

 2               WESTERN DISTRICT OF LOUISIANA

 3                     MONROE DIVISION

 4
     UNITED STATES OF AMERICA        )
 5                                   )
     VS.                             )   CRIMINAL ACTION
 6                                   ) NO. 3:22-CR-00267
     ROBERT SCOTT BROWN, JR.         )
 7   _____ )

 8

 9                MOTION TO SUPPRESS HEARING
               OFFICIAL TRANSCRIPT OF PROCEEDINGS
10         BEFORE THE HONORABLE KAYLA D. McCLUSKY
                UNITED STATES MAGISTRATE JUDGE
11                      JUNE 7, 2023
                     MONROE, LOUISIANA
12   APPEARANCES:

13   FOR THE GOVERNMENT:
          AUSA JESSICA CASSIDY
14        U.S. Attorney's Office
          300 Fannin Street, Suite 3201
15        Shreveport, LA 71101-3068

16   FOR THE DEFENDANT:
          LAVALLE B. SALOMON
17        Attorney at Law
          P.O. Box 14596
18        Monroe, LA 71207

19

20

21   Produced by mechanical stenography, transcript produced by
     computer.
22
                      DIANA CAVENAH, RPR
23              FEDERAL OFFICIAL COURT REPORTER
                300 FANNIN STREET, SUITE 4209
24               SHREVEPORT, LOUISIANA 71101
                       (318) 934-4754
25
```

1

<u>C O N T E N T S</u>

2

WITNESSES FOR THE GOVERNMENT:                    <u>Page</u>

3

<u>TESTIMONY OF BRIAN LEVINE, PH.D.:</u>

4          Direct Examination by Ms. Cassidy          7
           Cross-Examination by Mr. Salomon          321

5

6     <u>TESTIMONY OF SPECIAL AGENT WILLIAM SCULLEN:</u>
           Direct Examination by Ms. Cassidy          34

7          Cross-Examination by Mr. Salomon          52
           Redirect Examination by Ms. Cassidy       54

8

9     <u>TESTIMONY OF SERGEANT JAMES HUMPHREY:</u>
           Direct Examination by Ms. Cassidy          56

10         Cross-Examination by Mr. Salomon          65
           Redirect Examination by Ms. Cassidy       70

11

12                      <u>E X H I B I T S</u>

13    <u>Exhibit No.</u>               <u>Offered</u>       <u>Admitted</u>
      Government Exhibit 1          11            11

14    Government Exhibit 2          28            28
      Government Exhibit 3          30            30

15    Government Exhibit 4          42            42
      Government Exhibit 5          46            46

16    Government Exhibit 6          62            62

17

18

19

20

21

22

23

24

25

1    (Court called to order with the defendant present at

2    10:01 a.m.)

3        THE COURT:  We are here today in the case of

4    United States of America versus Robert Scott Brown, Jr.

5    That's case number 3:22-00267 and we are here today for a

6    motion to suppress hearing.  Counsel, do you want to make

7    your appearances for the record?

8        MS. CASSIDY:  Yes, Your Honor.  Good morning.

9    Jessica Cassidy on behalf of the government.  I would point

10   out that seated with me at counsel table is --

11       THE COURT:  Yes.

12       MS. CASSIDY:  -- Jeff Goodwin.  He is our summer

13   intern.

14       THE COURT:  Okay.

15       MS. CASSIDY:  If the Court would not mind him

16   sitting in.

17       THE COURT:  I do not mind at all.  We are happy to

18   have you, Mr. Goodwin.  And I hope if there is anything we

19   can help you with about learning about federal practice,

20   we're happy to do that.

21       MS. CASSIDY:  And then also seated at counsel

22   table is the case agent, FBI Special Agent Jonathan Capers.

23       THE COURT:  Thank you very much.

24       MR. SALOMON:  Val Salomon, Your Honor.  I'm here

25   on behalf of Mr. Brown who is also present.

1    THE COURT:  All right.  Ms. Cassidy?

2    MS. CASSIDY:  Your Honor, our first witness will

3    be Professor Brian Levine.  I have two other witnesses and

4    at this time I'd tell the Court I've advised him of the

5    rule of sequestration and they can sit in the witness room,

6    if it's agreeable.

7    THE COURT:  That is --

8    MR. SALOMON:  That's fine.

9    THE COURT:  -- certainly how we normally do it, so

10   let's go ahead and proceed with the first witness.

11   MS. CASSIDY:  All right.

12   MR. SALOMON:  Your Honor, I have spoke to

13   Ms. Cassidy and --

14   THE COURT:  Okay.  Before we proceed any further,

15   the court reporter has asked that you guys make sure you're

16   talking into your microphone.  She is having trouble hearing

17   you guys and maybe me, too.  I'll try to do my best, too.

18   MR. SALOMON:  I spoke to Ms. Cassidy and I think

19   we both agree that two-thirds of my motion deal with bare

20   bones and staleness, which simply is argument based upon the

21   four corners of the warrant, and then we'll decide whether

22   we -- whether there's going to be any witness testimony

23   regarding the third aspect of my argument.

24   THE COURT:  All right.  So you're only going to

25   provide testimony on that third aspect; is that what you're

1  saying?

2         MR. SALOMON:  Yes.  That one there may be some

3  testimony, maybe not.

4         THE COURT:  Okay.

5         MR. SALOMON:  Because I've gotten some further

6  information and it probably answers my questions, quite

7  candidly.

8         THE COURT:  Okay.  Well, if at any point we don't

9  need further testimony, then you let us know, Mr. Salomon.

10        MR. SALOMON:  I'm sure you'll be heartbroken.

11        THE COURT:  Yeah.

12     All right.  In that case, Ms. Cassidy, if you want to

13  proceed with your first witness.  Is there anything else we

14  need to address?

15        MR. SALOMON:  Just argument right now if we're --

16        THE COURT:  Oh, you want to make argument right

17  now?  I'm sorry.

18        MR. SALOMON:  Just regarding the three aspects.

19        THE COURT:  Okay.

20        MR. SALOMON:  One is bare bones argument of the --

21  with the state warrant that was involved here, which would

22  be within the four corners of the warrant, nothing beyond.

23        THE COURT:  Right.

24        MR. SALOMON:  And then a staleness argument was

25  also with the four corners of the warrant, so that -- it's

1    argument only.

2                    THE COURT:  Okay.

3                    MS. CASSIDY:  And, Judge, and I apologize, I agree

4    with Mr. Salomon that part of that is argument.  I didn't

5    know if maybe it would be better to save those arguments for

6    at the end of the hearing, only because of the good faith

7    exception and how that's the first thing that courts look to

8    with regard to allegations of bare bones affidavits.

9                    THE COURT:  Right.  That's what -- I thought we

10   were going to take testimony first and then y'all can make

11   any argument --

12                    MR. SALOMON:  Whichever.

13                    THE COURT:  -- you want to make.

14                    MS. CASSIDY:  Why don't we do that.  If it's

15   agreeable, let's do that.

16                    MR. SALOMON:  Okay.  That's fine.

17                    THE COURT:  Okay.  Yeah.  I misunderstood.  I

18   thought that's what we were doing.

19                    MS. CASSIDY:  Okay.  Mr. Levine.

20                    THE COURT:  We really do need you now.

21                    THE WITNESS:  Good morning, Your Honor.

22                    (Witness sworn.)

23                    MS. CASSIDY:  And, madam court reporter, if you

24   could go ahead and turn on the screen.  I know we'll need it

25   for his testimony.

1  BRIAN LEVINE, PH.D.

2  having been first duly sworn to testify the truth, the whole

3  truth, and nothing but the truth, testified as follows:

4  DIRECT EXAMINATION

5  BY MS. CASSIDY:

6  Q    Good morning.

7  A    Good morning.

8  Q    Would you state and spell your name for the record?

9  A    My name is Brian Levine.  B-R -- B-R-I-A-N.  Levine,

10  L-E-V-I-N-E.

11  Q    Are you currently employed?

12  A    I am.

13  Q    Where are you employed?

14  A    The University of Massachusetts in the College of

15  Information and Computer Sciences.

16  Q    How long have you been employed by the University of

17  Massachusetts?

18  A    Since 1999.

19  Q    What's your title or your position?

20  A    Professor.

21  Q    Is that a tenured position?

22  A    It is.

23  Q    When did you receive tenure?

24  A    2005.

25  Q    Do you have any particular subject matters that you

1  specialize in?

2  A    Yes.  Since I've been there, I've been specializing in

3  networks and security, privacy and forensics.

4  Q    Do you teach any courses related to those subject

5  matters?

6  A    I do.

7  Q    What are some of the courses that you teach?

8  A    Most recently, I've been teaching a course on digital

9  forensics.  In the past I have taught courses on computer

10  networks, intro to security, introduction to programming, a

11  variety of graduate-level seminars on the latest research.

12  A lot of these are listed in the CV.  All of them --

13      (Off the record.)

14      Graduate-level seminars on the latest research is what

15  I believe I said.

16  Q    (BY MS. CASSIDY) And you alluded to this in your last

17  response, but at what academic levels are these courses?

18  A    Both at the undergraduate and the graduate level.

19      MS. CASSIDY:  Mr. Goodwin, can you pull up

20  Government Exhibit 1?

21  Q    (BY MS. CASSIDY) And, Professor Levine, do you

22  recognize what this document is?

23  A    I do.  It's my CV.

24      MS. CASSIDY:  Mr. Levine -- or I'm sorry.

25  Mr. Goodwin, if we could scroll down to the bottom of page

1.

1   Q    (BY MS. CASSIDY) Professor Levine, if you would just
2   describe your educational background.
3   A    Yes.  My undergraduate degree is from what's now called
4   the University at Albany but was called the State
5   University of New York at Albany.  I graduated in 1990 with
6   a degree combined in Applied Mathematics and Computer
7   Science.  And from there, I went to graduate school at the
8   University of California, Santa Cruz, where I received a
9   master's degree and subsequently a Ph.D. in Computer
10  Engineering, and my research focused on the internet,
11  broadly speaking.
12          MS. CASSIDY:  And, Mr. Goodwin, if you would just
13  toggle over through pages 3 through 8.  And stop right
14  there.  I apologize, Mr. Goodwin.
15  Q    (BY MS. CASSIDY) Starting here -- and, Professor, you
16  know you are seeing it better than anyone, but over the
17  course of these next few pages, do these discuss your
18  peer-reviewed papers?
19  A    It does.
20  Q    Do many of these papers relate to computer forensics
21  and child exploitation?
22  A    They do.
23          MS. CASSIDY:  And, Mr. Goodwin, if we could go
24  back to page 2 of the CV.  Thank you.


1   Q    (BY MS. CASSIDY) Professor Levine, I have noted

2   something on the screen, "2020 ACM Fellow."  Can you

3   explain what that is and what it relates to?

4   A    Yes.  So the ACM is a professional society.  It stands

5   for the Association for Computing Machinery.  It's a society

6   that I believe it started in the 1940's.  It's a -- it's a

7   professional society for people who research and are

8   practicing computer scientists, and they have different, I

9   guess you might call it, status levels, so this is the

10  highest status level called a fellow.  And as you can read

11  there, it's based upon a nomination and review process by a

12  distinguished selection committee and this status is

13  reserved by -- I guess "bylaws" would be the words of the

14  society -- bylaws for the -- for just one percent of the

15  total membership of the society.  And when you're elected a

16  fellow, and I was, there is a specific sentence there --

17  citations, I think, is the better word for why you become a

18  fellow.  And so, for me, these were contributions to my work

19  in forensics, security, and privacy and for thwarting crimes

20  against children.

21  Q    Thank you.

22       MS. CASSIDY:  And, Mr. Goodwin, lastly, will you

23  turn to page 8 of the CV?  Right there.  Thank you.

24  Q    (BY MS. CASSIDY) Professor Levine, have you been

25  qualified to testify as an expert witness previously?

1    A    Yes.

2    Q    And are all of those expert testimony and where they

3    were located, is that reflected in your CV?

4    A    Yes, it is.

5    Q    Fair to say, without reading out the various courts,

6    that you've been qualified as an expert witness in numerous

7    federal district courts?

8    A    Correct.

9         MS. CASSIDY:  Your Honor, at this time the

10   government would move into evidence Government Exhibit 1.

11        THE COURT:  Any objection?

12        MR. SALOMON:  No objection, Your Honor.

13        THE COURT:  Okay.  That's received into evidence.

14   Q    (BY MS. CASSIDY) And, lastly, Professor Levine, what

15   have been some of the areas in which you were qualified as

16   an expert witness?

17   A    Peer-to-peer networking and network security, computer

18   science and forensics.  I'm just reading off the list here.

19   Digital forensics.

20        MS. CASSIDY:  Your Honor, at this time the

21   government would tender Professor Levine as an expert

22   witness in the field of networking and digital forensics.

23        THE COURT:  Networking and digital forensics;

24   is --

25        MR. SALOMON:  Yeah, I have no --

 1          MS. CASSIDY:  -- that what you said?  Do you have

 2    any objection?

 3          MR. SALOMON:  No objection.

 4          THE COURT:  No objection?

 5          MR. SALOMON:  No.

 6          THE COURT:  Okay.  Then I do find him qualified in

 7    the field -- so say it one more time for me.

 8          MS. CASSIDY:  I apologize, Your Honor.

 9    Networking and digital forensics.

10          THE COURT:  Networking and digital forensics.

11          THE WITNESS:  Thank you, Your Honor.

12    Q    (BY MS. CASSIDY) Professor Levine, my intention of your

13    testimony today is to provide the Court with an overview of

14    various topics.  So, with that said, can you provide an

15    overview of what is peer-to-peer networking and how it

16    works?

17    A    So peer-to-peer networking -- if you don't mind, let me

18    first define it by what it's not.  More commonly, all of

19    us -- at this point, probably everyone here has a cell phone

20    or a computer they use regularly, and I think we're used to

21    using what's often called a client server.  So a good

22    example of that would be, say, Netflix or Spotify, if you

23    use those services, and, again, at a very high level, in

24    those cases, we, as users, are clients, and we contact a

25    central location called a server, sometimes often called a

1  web server, or something out there in a warehouse, which is

2  commonly called the cloud, and we will contact Netflix and

3  stream a movie down, and another person who has subscribed

4  to Netflix will contact, as the client, the Netflix server

5  and stream a movie down, but what we won't do, typically in

6  this model, is contact other Netflix subscribers for any of

7  that movie.  The same thing with Spotify and other streaming

8  services.  So peer to peer is a different approach.  There

9  is no central server that someone has set up as part of the

10  company or an organization.  Instead, there are just other

11  peers is the word.  And peers are people who have downloaded

12  software, say, and they run that software.  And to get

13  content from this peer-to-peer network, as it's called,

14  they will contact the other peers using this software and

15  say I'm looking for this particular music or movie, can you

16  give me, say, a part of it, and I will ask other peers for

17  the rest of the movie.

18  Q    And thank you for that explanation.  Are you familiar

19  with a software program known as Freenet?

20  A    I am.

21  Q    Have you researched Freenet?

22  A    Yes.

23  Q    Have you even written published papers about Freenet?

24  A    I have.

25  Q    Is Freenet a peer-to-peer network program?

1    A    It is.

2    Q    What is the purpose of Freenet?

3    A    Freenet has a few purposes.  I think at the highest

4    level, the goal is to share content among peers -- in other

5    words, among people -- who have also downloaded and are

6    running Freenet.  It has some other purposes.  They would

7    like their content to remain available for a long time and

8    they would like some modicum of privacy in terms of who has

9    made that content available and who is currently downloading

10   that content.

11   Q    And when we say "content," do we mean like files?

12   Images?  Videos?

13   A    All of those -- anything you can make into a computer

14   file, it could potentially be shared in Freenet.  So, yes,

15   that includes videos, images, and so on.

16   Q    How does one access Freenet?

17   A    It's freely available.  For example, you could just go

18   to Google or your favorite search engine and type "Freenet

19   Project," for example.  You know, I would expect it would

20   appear among the first hits.  You'll end up at their web

21   page.  And from the web page, you'll notice a download link,

22   and then that software is free to download.  There is no

23   registration, not even free registration.  You can just

24   click the download link, and then it's available on your

25   computer at no charge.

1    Q    Are you familiar with the term "open source software"?

2    A    I am.

3    Q    What does that mean?

4    A    So it means -- so all software has been created from

5    some source code is what we call it.  It's what's been typed

6    into the computer by a programmer.  And then there is a

7    process by which the programmer compiles that into a single

8    executable.  And most often when we purchase software, we

9    just get that little executable that we can double click.

10   But with open source software, you can actually download and

11   inspect the original source code, the programmer's work,

12   that went into it.

13   Q    And so is it fair to say that you can modify that

14   source code?

15   A    Absolutely.

16   Q    Is Freenet an open source software?

17   A    It is.

18   Q    What happens when a person downloads Freenet?

19   A    So once you download it and you begin to execute the

20   installation program, it will run through what's commonly

21   called a wizard, a configuration wizard.  You may not have

22   heard that term, but it's when you install software and you

23   keep hitting next, next, next.  And so the configuration

24   wizard will run, you'll select various options, and when

25   you're done with it, if everything worked out okay, you'll

1    be able to finally just run the program and, ideally, not

2    run that installation step ever again.

3    Q    Are you familiar with the terms "open net mode" and

4    "dark net mode"?

5    A    Yes.  So, in particular, for Freenet, during that

6    configuration stage, during the configuration wizard, while

7    you're installing it, it will ask you to make several

8    decisions.  One of the decisions is whether you would like

9    to run in what's called open net mode or dark net mode.

10   Q    And can you explain the different modes to the Court?

11   A    So with dark net mode -- I'll start there -- the idea

12   is that you are aware of someone else who is also running

13   Freenet.  You could be friends with them at work.  You might

14   have met them online in a forum and never actually met them

15   in person.  But with dark net mode, you tell the software --

16   I'll just call them your "friend" -- this is my friend and I

17   would like my computer to connect to their running instance

18   of Freenet.  And if dark net -- the intention of dark net

19   mode is that you are only connected to these friends.

20        Now, with open net mode, you are connecting to

21   strangers and I use the word "stranger" because on the

22   installation screen, it says in open net mode, you will

23   connect to, quote, "strangers."  So this is probably more

24   common because most people don't know anyone running

25   Freenet.  It's not the world's most popular software, like,

1    say, Spotify or Netflix, and the software will do this work

2    behind the scenes to find these other strangers from your

3    Freenet and they become your direct peers or neighbors,

4    sometimes they are called.

5    Q    And we'll get into the specifics in a minute of how

6    open net versus dark net works with regard to file sharing,

7    but I did want to ask you, when you download Freenet, are

8    you allocating a portion of your hardware space?

9    A    Yes.  That is one of the questions during the

10   configuration process, how much of your hard drive space

11   would you like to reserve for Freenet to use.

12   Q    And so can you explain then -- and use me for an

13   example, I have downloaded Freenet onto my computer.  I

14   reserved a portion of my hard drive.  What does that mean

15   for purposes of Freenet?

16   A    Well, so, remember, as I said, one of the differences

17   between client server, like Netflix and Spotify, in a

18   peer-to-peer system is that the content that you would like

19   to retrieve is held with other peers.  So when you run

20   Freenet, you, yourself, run Freenet, and you reserve that

21   space, it will start to be filled up with content that has

22   been inserted by others using Freenet.

23   Q    And is it -- let's say another user uploaded a file on

24   Freenet.  Am I receiving that whole file in my allocated

25   space?

1    A    No.  And if you are familiar with other peer-to-peer

2    systems, this is one of the differences with Freenet.

3    But, if you're not, in short, as you said, when I insert

4    something into Freenet to make it available to others,

5    everyone else who is running Freenet will get a small

6    fraction of that entire file.  So maybe what you're seeing

7    is -- I'll leave it at that.

8    Q    So with regard to open net mode, these strangers are

9    getting randomly anybody's pieces of a file?

10   A    Correct.

11   Q    So what process -- and you alluded to it with the

12   pieces, but what process takes place when someone uploads a

13   file onto Freenet?

14   A    So, at a very high level, ignoring a tremendous number

15   of details, I will be running the Freenet software.  I will

16   use the software to -- I will say I would like to upload

17   something now, and it will say please locate, let's say, a

18   video on your hard drive that you would like to share with

19   the rest of the world who is running Freenet.  And, again,

20   at a high level, you can think of it as the software will

21   smash it into pieces, sometimes they're called blocks, and

22   then these blocks will be scattered around the world to

23   everyone who is running Freenet.  Again, not all blocks to

24   every person.  Some blocks with one person running Freenet,

25   and some blocks with another person running Freenet.  And

1    that -- yeah, I'll leave it at that.

2    Q    And then once the file is uploaded and broken, is it

3    encrypted?

4    A    Yes.  Well, to be clear, it's encrypted before it's

5    uploaded to others.  And so that way -- you know, in your

6    example, you were running Freenet.  You donated the space.

7    The software will store, as that content, little blocks of

8    files that have been inserted by others and you'll receive

9    those blocks in an encrypted state.

10   Q    And then is there some type of key or something

11   associated with the file so that it can be retrieved?

12   A    Yes.  So backing up, I said if I would like to share a

13   video on Freenet, I will smash the file into pieces.

14   Encrypted versions of those blocks of pieces will be

15   uploaded to others.  And when the software is done with

16   that, and if it's successful, it will say here is what's

17   called a key.  The full term is a manifest key.  It looks

18   very similar to a URL.  If I were to point you towards an

19   article in the New York Times, I would give you a full URL.

20   I think we have seen sometimes URLs can get very long and

21   unwieldy.  The Freenet -- and I'll just use the word "URL"

22   right now -- the Freenet URLs are much longer, full of

23   random characters, but, at a high level, what they contain

24   is where to start to get the list of blocks that you would

25   like to retrieve to recreate this video that someone else

1    has uploaded, and the other part of it is the password, the

2    decryption password.  So as a user of Freenet, you are

3    storing blocks that are encrypted, but as a downloader of

4    Freenet you have the key to decrypt them and, as I said, you

5    have -- you know where to go to get the list of blocks that

6    you need, the manifest of blocks that you need.

7              THE COURT:  Let me ask this question -- and you

8    might be getting to this, Ms. Cassidy, so I'm not trying to

9    jump in where you are --

10             MS. CASSIDY:  No.  Go ahead, Your Honor.

11             THE COURT:  -- but I'm trying to make sure I

12   understand, though, because all those details I wouldn't

13   understand, and I appreciate you leaving some of those

14   details out, but --

15        So when it breaks -- so when Freenet breaks it into

16   blocks or the user breaks it into blocks, the person who has

17   the key and who wants to download, they can eventually get

18   the whole video?

19             THE WITNESS:  Correct.

20             THE COURT:  One block at a time or something?

21             THE WITNESS:  Correct, Your Honor.

22             THE COURT:  Okay.

23             MS. CASSIDY:  And that was my next area.

24             THE COURT:  Okay.  I was afraid I was jumping you.

25   I'm sorry.

 1          MS. CASSIDY:  No, I appreciate it, Your Honor.

 2   Q    (BY MS. CASSIDY) Professor Levine, provide the Court

 3   with a 100-point view of how a file is retrieved and what

 4   that entails.

 5   A    May be 100,000-foot view, though.

 6   Q    Okay.  That's fine.

 7   A    For downloading the file and what it entails is what

 8   you said?

 9   Q    Yes.

10   A    So I said a little bit of this.  So I am running the

11   Freenet software.  I have been given, I'll call it, this

12   URL for what I would like to download.  I give this to the

13   software.  The software retrieves a manifest list of what's

14   in there.  You can think about -- the word "manifest" is

15   very appropriate.  It's a word we use for the contents of a

16   ship.  I'd like to think of this as a little bit similar to

17   IKEA.  If I go to IKEA, there is just thousands of parts to

18   it.  A desk I need to reconstruct, it will come with a list

19   of parts that I should have if I am going to construct the

20   desk appropriately.  So similarly here, the software will

21   download these list of blocks.  If you download enough of

22   them, then you can decrypt them and reconstruct the original

23   video and then it's yours to view or do what you want with

24   it.

25   Q    And with regard to when you input this manifest, is

1    Freenet then going out and searching peers?

2    A     Okay.  So that's another level of detail.  So, as I

3    said before, when you join the net -- when you install the

4    software and you run it, we talked about connecting to

5    strangers, and there is a process where you can think of it

6    as arbitrarily finding other people on the internet running

7    the Freenet software.  And what I will say is I have a

8    direct connection to them.  And what I mean by that is

9    imagine you're in a room of a thousand people, you can't

10   have everyone talking at once.  And if you need all thousand

11   people to communicate with one another, what they'll do is

12   just talk to the, let's say, 10 people around you in the

13   room and ask them to relay messages to other people in the

14   room.  Otherwise it's too hard to keep track of that many

15   people at once.

16         So, similarly, in Freenet, a user who is downloading a

17   file has this list of blocks they would like to request from

18   others and they're not going to request it from all thousand

19   peers or many thousand peers running Freenet, they're going

20   to request it of just the 10 neighbors or strangers that

21   they have been connected to.  So their software will ask the

22   software of their neighbor do you have this block, and that

23   is a request that is intended for that neighbor, and if you

24   have it, you can respond and give it to me.

25         And, further, the way Freenet works is they say when

1  your computer makes this request to this other user, the

2  request says, if you have it, please respond, but if not,

3  ask your neighbors.  And so, hop by hop, you might say, the

4  request will go from one neighbor to one of their neighbors.

5  And either it will succeed and make its way back to the

6  original requester from these relaying neighbors, or it will

7  fail, in which case, a little while later you might say that

8  didn't work for me and I may ask another neighbor do you

9  have this request.  And, eventually, if enough requests

10  succeed, then I can reconstruct the file.

11  Q     And you testified earlier that an image or a file is

12  encrypted when it's uploaded?

13  A     Uh-huh.

14  Q     And then it's broken apart, correct?

15  A     Correct.

16  Q     And it's placed randomly on people's hard drives?

17  A     Correct.

18  Q     The person who is the original requester, is it fair to

19  say they know the file that they're looking for?

20  A     Correct.

21  Q     Whereas someone who is merely relaying a request, would

22  they know necessarily what the file is that this original

23  requester is looking for?

24  A     Not necessarily, especially since the requests are not

25  for a human-readable string.  It doesn't say this particular

1    video named "Alice and Bob at the Park."  Instead, it's a

2    numerical representation of that content, what's often

3    called a cryptograph or what is called a cryptographic hash.

4    It's a digital fingerprint of what's in there.  I don't know

5    if we need to get into how that works, but it's not a

6    human-readable string is my point.

7            (Off the record.)

8                THE WITNESS:  String.  I'm sorry.  That's a

9    computer science word for text.

10   Q    (BY MS. CASSIDY) And, Professor Levine, thank you for

11   going through that.  I know it was daunting.  But in your

12   studies and research of Freenet, have you found the software

13   program to be used for any nefarious reasons?

14   A    I have.

15   Q    What are some of those reasons?

16   A    So, in our peer-reviewed paper, we documented that when

17   we took a look at the network and what was being

18   requested -- because when a request comes in, if you have

19   a -- let me just say this simply.  So in our peer-reviewed

20   paper, we looked at the type of files that were being

21   requested by peers on Freenet, and at least 30 percent of

22   the time those requests were for files related to child

23   sexual exploitation, and we repeated that experiment four

24   times over four years and that was true each time.

25   Q    And have you assisted law enforcement in any capacity

1  with regard to Freenet?

2  A    I have.

3  Q    And are you actually performing contract work with the

4  FBI?

5  A    I do.

6  Q    In what ways have you assisted law enforcement?

7  A    So, in general, we have provided them tools for

8  network-based investigations of typically child sexual abuse

9  and for crimes related to child sexual abuse.  Specifically

10  for Freenet, we provided them software so that they could

11  perform forensically-sound investigations of, as I said,

12  crimes against children on Freenet.

13  Q    Thank you.  I want to talk a little bit about that

14  software program.  You previously testified that Freenet is

15  an open source software, correct?

16  A    I did.  It is.

17  Q    Can you explain the software program that you have

18  created?

19  A    Yes.  So, as you said, Freenet -- as I said, Freenet is

20  an open source software and so we were able to download the

21  source code for Freenet, and then we were able to make small

22  modifications to it so that the same software could be used

23  by law enforcement in an undercover capacity and, in

24  particular, modifications be made, allow them to record

25  information while they used it in this undercover capacity

1   so that they could make conclusions related to an
2   investigation.
3   Q    You said that the modification was that it records
4   information.  What type of information is being recorded?
5   A    So we record information that is already available to
6   users.  Freenet can also record this information for you,
7   but then it also records a lot of other information that
8   wouldn't be useful in an investigation, like extraneous
9   information.  I'm sorry, Your Honor.
10              THE COURT:  Go on.
11              THE WITNESS:  Okay.  So specifically what I'll
12  call the law enforcement version of Freenet that we wrote
13  records information related to how many requests came from a
14  neighboring peer of law enforcement, at what time that
15  request was made, what the actual request was for, like what
16  specific block was requested, and a few other details that
17  allow them to conduct an investigation.
18  Q    (BY MS. CASSIDY) And I think you said this, but this
19  information is available to all Freenet users?
20  A    Correct.
21  Q    The law enforcement version doesn't create some
22  proactive mechanism to it that allows law enforcement to go
23  into somebody's hard drive?
24  A    That's correct.  The law enforcement version doesn't
25  act any differently than anyone else running Freenet.  It

1   doesn't -- it doesn't hack into the neighbor's computer.

2   It doesn't send any messages that aren't already part of the

3   normal operation of Freenet.

4   Q    Is it fair to say that the law enforcement version is

5   like a passive receiver of requests like other peers?

6   A    Correct.

7   Q    Have you also assisted law enforcement by developing an

8   algorithm or technique with regard to Freenet?

9   A    I have.

10  Q    What is the goal or purpose of the algorithm?

11  A    So, as I mentioned earlier, one of the goals of

12  Freenet was to provide some level of privacy to the users

13  who are downloading or uploading content into it.  And so

14  the purpose of the algorithm is to allow law enforcement to

15  determine when they receive a request whether this request

16  is -- whether the request originated with their neighbor or

17  whether that neighbor is merely relaying this request for

18  someone else.  Because, recall, I said when you download

19  something in Freenet, you make a request of the neighbor and

20  you say to the neighbor, if you don't have what I'm looking

21  for, please get it from one of your neighbors.  So, on the

22  flip side of that, if you are receiving a request, Freenet

23  makes it difficult for any single request to determine if

24  it's originating with the neighbor who sent it or whether

25  there earlier.

1  Q    And have you reviewed Freenet's website?

2  A    I have.

3  Q    Does Freenet even contemplate that someone could figure

4  out who was their requester of a file versus who was a

5  relayer?

6  A    They do.

7        MS. CASSIDY:  Mr. Goodwin, can you pull up

8  Government Exhibit 2?  And, Mr. Goodwin, if you want to

9  scroll down so that the "Correlation attacks" section is

10  visible.  Thank you.

11  Q    (BY MS. CASSIDY) Professor Levine, do you recognize

12  this snapshot?

13  A    I do.  It's a portion of their help page on their

14  website.

15  Q    "Their" being Freenet?

16  A    "Their" being Freenet Project, correct.

17        MS. CASSIDY:  Your Honor, at this time the

18  government would move into evidence Government Exhibit 2.

19        THE COURT:  Any objection?

20        MR. SALOMON:  No objection, Your Honor.

21        THE COURT:  That's received into evidence.

22  Q    (BY MS. CASSIDY) Professor Levine, if you would just

23  read the first sentence after "Correlation attacks."

24  A    It says, "If you are connected to a node, and can

25  recognize the keys being requested (probably because it was

1  posted publicly), you can show statistically that the node

2  in question probably requested it, based on the proportion

3  of the keys requested from that node, the locations of

4  nearby nodes, the HTL," or Hops to Live, "on the requests

5  and so on."

6  Q    And there is actually something in here that I want to

7  ask you about before we get further into this, but this

8  states that "probably because it was posted publicly."  Is

9  the manifest key sometimes posted somewhere for others to

10  access it?

11  A    Yes, it is.

12  Q    So, for example, if I posted -- or if I uploaded a file

13  and received a manifest key, where could I post it so that

14  that manifest is made available to others?

15  A    Well, so, as you said, first of all, you can decide not

16  to, but, of course, you're inserting it so that someone else

17  can download it.  So you have a lot of choices.  You can

18  send it by text to a friend of yours.  You can email it to

19  someone.  You can publish it on any website that we all go

20  to on the regular internet, or there are forums on Freenet

21  itself that other Freenet users can see and only Freenet

22  users and you can post it on those forums.

23  Q    And turning back now to what you just read on the

24  Freenet page, essentially what is Freenet warning its users

25  of?

1   A    It's warning that the privacy that they aim to protect

2   is not perfect and that with the information that they state

3   it could be de-anonymized, I would say.

4   Q    And not to oversimplify your work, but is that

5   essentially what your algorithm or technique does?

6   A    Correct.

7   Q    You testified previously that you published papers

8   related to Freenet.  Did any of those papers relate to your

9   algorithm?

10  A    They did.

11  Q    And was that paper peer-reviewed?

12  A    There were two and both were peer-reviewed.

13         MS. CASSIDY:  Mr. Goodwin, if you would just pull

14  up Government Exhibit 3.

15  Q    (BY MS. CASSIDY) Professor Levine, do you recognize

16  this document?

17  A    I do.

18  Q    What is it?

19  A    This is the second of the two peer-reviewed papers that

20  was published in 2020.

21         MS. CASSIDY:  Your Honor, at this time the

22  government would move into evidence Government Exhibit 3.

23         MR. SALOMON:  No objection, Your Honor.

24         THE COURT:  Exhibit 3 is received into evidence.

25         MS. CASSIDY:  And, Your Honor, based upon the

1  motion to suppress and in speaking with defense counsel, it

2  doesn't appear the defendant is challenging the veracity of

3  the algorithm.  I just wanted to make it available to the

4  Court.

5          THE COURT:  Okay.

6          MS. CASSIDY:  So I don't intend to ask any

7  questions about the specifics at this time.

8          THE COURT:  All right.

9  Q    (BY MS. CASSIDY) So, Professor Levine, in short, does

10 the algorithm take information that is known to Freenet

11 users to determine who is the original requester versus who

12 is merely relaying a request for a file?

13 A    Correct.

14 Q    And has this algorithm been shared with law enforcement

15 to aid in your investigation?

16 A    It has.

17 Q    And, to be clear, you did not work specifically on this

18 case that we're here today?

19 A    I did not.

20         MS. CASSIDY:  Thank you, Your Honor.  I'll tender.

21         THE COURT:  Any questions, Mr. Salomon?

22         MR. SALOMON:  Just a handful.

23                    CROSS-EXAMINATION

24 BY MR. SALOMON:

25 Q    Professor, if I may back up.  I assume you're aware of

1  the cases where, let's say, Google or Meta or someone found

2  some CSAM materials and then reported it to law enforcement?

3  A    I am aware that that happens.

4  Q    Okay.  Now, with the Freenet, that is not what

5  occurred.  There is no, like, Google or someone else out

6  there that's monitoring and then reporting to law

7  enforcement?

8  A    Correct.

9  Q    In this instance, from the paperwork that I've seen and

10  been supplied, apparently you -- and, as it warrants, you

11  are publicly publishing what you're seeking --

12  A    Correct.

13  Q    -- right?

14  A    As downloaded.

15  Q    That can be downloaded.  And that is -- is that your

16  understanding of what occurred here, by way of this law

17  enforcement, I guess, algorithm that was supplied to them?

18  In other words, to let them modify it and then access the

19  public aspect of Freenet?

20  A    Can you clarify what you are specifically talking

21  about?

22  Q    Well, I'm saying you supplied information to law

23  enforcement so that they could access Freenet in the public

24  aspects of it; is that correct?

25  A    I supply to them software that allow them to conduct

1    investigations on --

2    Q    Okay.

3    A    -- the system that was already public.  I think that's

4    what you're asking.

5    Q    And that was my question.  So it's accessing what's

6    already public?

7    A    Correct.

8    Q    This isn't some sort of dark aspect or some nefarious

9    entry into the -- into Freenet or anything along those

10   lines?

11   A    No.

12   Q    This is something that if I entered into Freenet, I

13   could pull up the same public information?

14   A    Correct.

15   Q    Thank you.

16          MR. SALOMON:  That's all I have.

17          THE COURT:  All right.  Thank you.

18   Any further questions?

19          MS. CASSIDY:  No.  Your Honor.

20   Thank you, Professor.

21          THE COURT:  Okay.  Thank you, Professor.  I

22   appreciate it.  And I am interested, so I'm going to read

23   your article even if I don't read it for this motion.

24          THE WITNESS:  All right.  Thank you, Your Honor.

25          MS. CASSIDY:  Your Honor, and I don't know if

1    necessarily Mr. Levine needs to be released from his

2    subpoena since he is the expert, but if he would be

3    permitted to stay in the courtroom.

4            THE COURT:  Any objection?

5            MR. SALOMON:  No objection.

6            THE COURT:  Then it certainly is.

7            MS. CASSIDY:  All right.  Your Honor, Agent Capers

8    is going to go get our next witness which is Special Agent

9    William Scullin.

10            (Witness sworn.)

11                    SPECIAL AGENT WILLIAM SCULLIN,

12    having been first duly sworn to testify the truth, the whole

13    truth, and nothing but the truth, testified as follows:

14                    DIRECT EXAMINATION

15    BY MS. CASSIDY:

16    Q    Good morning.

17    A    Good morning.

18    Q    Would you state and spell your name for the record?

19    A    Yes.  William Scullin.  That's S-C-U-L-L-I-N.

20    Q    How are you employed?

21    A    I'm a special agent with the FBI.

22    Q    How long have you been with the FBI?

23    A    Five years.

24    Q    Prior to the FBI, were you employed in any other law

25    enforcement capacity?

1    A    Yes.  I was a special agent with the Air Force Office

2    of Special Investigations for nine years.

3    Q    And as it specifically relates to your current position

4    with the FBI, are you assigned to any particular unit?

5    A    Yes.  Currently, I am assigned to the Child

6    Exploitation Operation Unit in Maryland.

7    Q    How long have you been with that unit?

8    A    Approximately seven months.

9    Q    What are some of your duties and responsibilities

10   there?

11   A    Broadly, I investigate suspected or alleged violations

12   of U.S. law.  The squad I'm currently assigned to focuses on

13   undercover operations and the exploitation of -- the sexual

14   exploitation of children in travel and tourism.

15   Q    And I assume those investigations involve child sexual

16   abuse material?

17   A    Yes, they do.

18   Q    Is that also known by the acronym CSAM?

19   A    Yes, ma'am.

20   Q    Prior to joining the unit, what division or section of

21   the FBI were you assigned?

22   A    I was assigned to the New Orleans division,

23   specifically the Shreveport satellite office.

24   Q    What were some of your duties and responsibilities?

25   A    Again, broadly, I investigated suspected or alleged

1    offenses of U.S. law, specifically focusing on violent

2    crimes against children.

3    Q    In addition to your on-the-job experience, did you

4    receive training with regard to your investigations?

5    A    I did, yes.

6    Q    Did part of that training include Freenet?

7    A    Yes.

8    Q    I'd like to direct your attention to August of 2021.

9    Did you begin an investigation involving CSAM being

10   downloaded in the Monroe area?

11   A    Yes, ma'am.

12   Q    Were you the case agent at that time?

13   A    I was.

14   Q    How did that investigation first come to your

15   attention?

16   A    I received a lead through a law enforcement database

17   that I was given access to after I completed specific

18   training requirements that essentially collects information

19   on suspected instances of online sexual child exploitation

20   offenses.

21   Q    And why was that lead sent to you in particular?

22   A    So at the time I was the only FBI agent that was

23   Freenet certified, which had to do with this investigation,

24   investigatively responsible for the northern half of

25   Louisiana.

1  Q     The lead that you received, did it involve Freenet?

2  A     It did, yes, ma'am.

3  Q     And according to this lead, when were the suspected

4  CSAM images being downloaded?

5  A     It was May and July of 2021.

6  Q     Did the lead give you an IP address associated with

7  that?

8  A     It did, yes, ma'am.

9  Q     And the Court has already heard testimony from

10  Professor Levine, but if you can just tell the Court, what

11  is your understanding of Freenet based upon your training?

12  A     Certainly.  So, in its simplest form, Freenet is an

13  internet-based, peer-to-peer network or platform.  It is

14  publicly available and free to download.  So anyone with

15  access to the internet and with access to a computer is able

16  to download the software.

17       The network itself is primarily used for users to share

18  files, but they can also do things such as chat on message

19  boards and visit sites within the network.  So, as I said,

20  users can share files on this network, which include

21  uploading and downloading files to and from the network.

22       So when a user installs Freenet on their machine, they

23  run the software and Freenet connects to other machines

24  running Freenet which are obviously also connected to the

25  internet.  Those connections are called peers.

1    So when a user decides to upload a file, Freenet, the

2    software, assigns a key to that file and the key is just a

3    long alphanumeric code that is really a file like in a file,

4    in a sense.

5    So when a user wants to download a file, they need that

6    specific key.  So if a user is unable to search for a file

7    name or file type, they need that specific key for a

8    specific file they are interested in.

9    Q    And let me stop you right there --

10   A    Yes.

11   Q    -- just because the Court has heard testimony on this.

12   But it's your understanding then that that key is sent out

13   to Freenet and it's requested of peers, and if those peers

14   don't have it, it's friend requested?

15   A    That's correct.  Yes, ma'am.

16   Q    Okay.  And I apologize for cutting you off.

17   A    No, no problem.

18   Q    I didn't want to replow old ground.

19   And did your training on Freenet specifically help in

20   determining how to identify who is requesting CSAM versus

21   who is merely relaying a request to CSAM?

22   A    Yes, ma'am.

23   Q    You testified about this lead, but did you rely solely

24   on that lead in your investigation?

25   A    No, ma'am.

1   Q     What did you do?

2   A     So I collected the lead information from the law

3   enforcement database and then, based on my training, we

4   learned a procedure to validate that that information was,

5   in fact, suspected to be a requester or originator of CSAM

6   files.

7   Q     So let's start with, how were you able to determine

8   first that this particular IP address in Monroe was, in

9   fact, requesting CSAM?

10  A     How did I first determine?

11  Q     Yes.  How did you determine that the file itself was,

12  in fact, CSAM?

13  A     Okay.  I'm sorry.  Okay.  I understand.  So what I did,

14  as part of that lead, I received the specific key to the

15  specific file that the IP address was requesting.  So those

16  files were suspected to be CSAM at the time, but, of course,

17  I validated and confirmed that.  So what I did is I inputted

18  the key into Freenet, downloaded the specific file related

19  to that key, viewed the file and confirmed that those files

20  met the statutory definition of child pornography.

21  Q     And then, you spoke to this a moment ago, but how did

22  you then determine that particular IP address was the

23  original requester of the download versus an individual

24  relaying a request for the download?

25  A     Yes.  So during my training we were provided a

1    procedure to follow to validate and confirm that that IP

2    address was, in fact, a requester.  Specifically that

3    procedure involved a spreadsheet with a mathematical

4    equation or algorithm embedded into that spreadsheet.  So I

5    inputted various amounts of data that I obtained from the

6    lead into the spreadsheet to ensure that it passed the

7    algorithm.

8    Q    And this algorithm, who was it created by?

9    A    In part or in whole by Professor Levine.

10   Q    What information would you put into this algorithm to

11   run the test?

12   A    Lots of data goes into the algorithm, into the

13   spreadsheet, and then into the algorithm.  But important

14   pieces are IP address, date and time, the number of peers,

15   and the number of requested blocks from an IP address.

16   Q    Is this information available to all users of Freenet?

17   A    Yes.  If the correct settings are set.

18   Q    Is there a certain amount of times that you run this

19   algorithm?

20   A    Yes.  In this specific investigation, I ran it three

21   times which related to three specific incidents where the

22   IP address requested specific CSAM files.

23   Q    And by running the algorithm that number of times did

24   you reach a result?

25   A    Yes, I did.

1   Q    And what was your result?

2   A    I validated that the IP address in question was an

3   originator or requester of those CSAM files.

4   Q    I might ask you a difficult question.  Do you remember

5   the IP address off the top of your head?

6   A    I do not.  I believe it began with "98 dot," but I'm

7   not sure of the rest.

8   Q    Okay.  Did part of your investigation include

9   identifying the service provider for the IP address?

10  A    Yes, ma'am.

11  Q    Which company was the service provider?

12  A    Comcast.

13  Q    Once you identified Comcast as the search provider, did

14  you issue an administrative subpoena?

15  A    Yes, ma'am.

16  Q    And specifically what were you looking for?

17  A    Basic subscriber information which included customer

18  name and address.

19        MS. CASSIDY:  Mr. Goodwin, if you could pull up

20  Government Exhibit 4.  And if you would scroll to page 2.

21  Q    (BY MS. CASSIDY) Agent Scullin, do you recognize this?

22  A    I do, yes.

23  Q    What is this?

24  A    This is the administrative subpoena I served to

25  Comcast.

1          MS. CASSIDY:  Mr. Goodwin, if you would go to

2   page 3 and page 4.  And now page 5.  I apologize.

3          Perfect.  Thank you.

4   Q    (BY MS. CASSIDY) Agent Scullin, is this the IP address

5   associated with the CSAM material?

6   A    Yes, ma'am.

7   Q    You list a series of dates and times on the subpoena.

8   What are those signifying?

9   A    Those are the specific dates and times that I

10  originally received the lead of the IP address in question

11  requesting blocks related to suspected CSAM files.

12  Q    So, in layman's terms, these are the dates and times

13  that the IP address was downloading child pornography?

14  A    Correct.  In the general sense, yes.

15  Q    Thank you.

16         MS. CASSIDY:  Your Honor, at this time the

17  government would move into evidence Government Exhibit 4.

18         MR. SALOMON:  No objection.

19         THE COURT:  Exhibit 4 is received into evidence

20  without objection.

21         MS. CASSIDY:  Mr. Goodwin, I'm sorry, would you go

22  back to page 1.

23  Q    (BY MS. CASSIDY) Agent Scullin, based upon the date,

24  when was the fax sent to Comcast?

25  A    September 2nd, 2021.

1  Q     And your investigation you said started in August of

2  2021?

3  A     Yes, ma'am.

4  Q     So within that time you had identified the CSAM

5  material and run your algorithm?

6  A     Yes, ma'am.

7  Q     Based upon the results provided by Comcast, to what

8  address and individual was the IP address subscribed?

9  A     Mr. Robert Brown at 3012 Deborah Drive in Monroe,

10 Louisiana.

11 Q     Once you got the information of this location as the

12 individual, did you immediately go do a search warrant?

13 A     No, ma'am.

14 Q     Why not?

15 A     So I generally will conduct further investigative

16 activity to ensure that the residents still live at that

17 address and also conduct basic law enforcement checks to

18 include criminal histories, social media, and open source

19 information, to get an idea of who else may live at the

20 residence.

21 Q     What did you learn about Robert Brown at 3012

22 Deborah Drive?

23 A     Robert Brown, Junior, or Senior?

24 Q     Senior.  I apologize.

25 A     No problem.  I learned that he did, in fact -- it

1  appeared that he still lived at the residence.

2  Q    Did you learn about any other individuals living at the

3  residence?

4  A    Yes.  Ms. Katherine Brown and Mr. Robert Scott Brown,

5  Jr.

6  Q    And you testified that you did other investigative

7  measures like criminal history checks.  Did you conduct

8  surveillance of the residence?

9  A    I did.  I conducted physical surveillance.

10  Q    Did you also do a social media search for these

11  individuals?

12  A    Yes, ma'am.

13  Q    Did you check their employment status?

14  A    Yes, ma'am.

15  Q    And where did you learn that Robert Scott Brown, Jr.

16  was employed?

17  A    He was employed by the Ouachita Parish School Board as

18  an IT professional.

19  Q    While you were investigating -- I'll just say the

20  Brown family -- in this particular residence, did you

21  receive any more leads from the law enforcement database

22  concerning this IP address?

23  A    I did.  I continuously received leads as the

24  investigation progressed regarding the IP address in

25  question continuously requesting blocks of suspected CSAM.

1  Q    When was the last time that this IP address was

2  associated with CSAM in a law enforcement lead?

3  A    It was December 2nd of 2021.

4  Q    As you're conducting your investigation, are you

5  speaking with other agents and law enforcement officials

6  about what you're uncovering?

7  A    Yes, ma'am.

8  Q    Who were some of them individuals you spoke with over

9  that period of time?

10  A    One individual was Investigator James Humphrey.

11  Q    And who was he in relation to this investigation?

12  A    So he was a task force officer assigned full time to

13  the FBI office in Monroe, but his parent agency was with the

14  Ouachita Parish Sheriff's Office.

15  Q    And what were some things that you would have discussed

16  with Investigator Humphrey?

17  A    In this case, it was the facts and circumstances of the

18  investigation to date, which included the background of what

19  Freenet is and how it works in the general sense and how my

20  investigation led to the house on Deborah Drive.

21  Q    On January 28 of 2022, did you obtain a federal search

22  warrant for the Deborah Drive residence?

23  A    I'm sorry.  I missed that date, ma'am.

24  Q    January 28th, 2022?

25  A    Yes, ma'am.

1          MS. CASSIDY:  And, Mr. Goodwin, if you would just
2    pull up Government Exhibit 5.
3    Q    (BY MS. CASSIDY) Agent Scullin, does this appear to be
4    the search warrant that you obtained?
5    A    Yes, ma'am.
6          MS. CASSIDY:  Your Honor, the government would
7    move into evidence at this time Government Exhibit 5.
8          THE COURT:  Any objection, Mr. Salomon?
9          MR. SALOMON:  I'm sorry.  I couldn't hear you.
10          THE COURT:  No objection, I assume?
11          MR. SALOMON:  No.
12          THE COURT:  Okay.
13          MR. SALOMON:  I'm sorry.
14          THE COURT:  That exhibit is also received into
15    evidence.
16          MS. CASSIDY:  Thank you, Your Honor.
17    Q    (BY MS. CASSIDY) What date did you execute the search
18    warrant?
19    A    February 1st of -- I'm getting my years mixed up.  It
20    would have been 2022.
21    Q    Did you have other law enforcement officials aid you in
22    the execution of the search warrant?
23    A    I did, yes, ma'am.
24    Q    Was Investigator Humphrey one of those individuals?
25    A    He was, yes.

1    Q    At the time you executed the warrant at the Deborah

2    Drive residence was anyone present?

3    A    Yes.

4    Q    Who was that?

5    A    It was Mr. Robert Scott Brown, Sr., and Mrs. Katherine

6    Brown.

7    Q    Did you conduct interviews of them?

8    A    I did, yes, ma'am.

9    Q    And I want to get to specifics of their interviews in

10   just a moment, but did law enforcement officials conduct an

11   on-site -- let me back up and lay a foundation.  During the

12   search, did law enforcement find electronic devices inside

13   that home?

14   A    Yes, we did, ma'am.

15   Q    Did agents do an on-site forensic search of those

16   devices?

17   A    We did.  We did what's called basically a forensic

18   preview, in a sense.  It's not a full forensic examination,

19   but gives us an idea of what type of files are on the

20   specific devices.

21   Q    Based upon that preview, was there any CSAM on those

22   devices?

23   A    There was not.

24   Q    And when you interviewed Robert Brown, Sr., and

25   Katherine Brown, what did they tell you that was relevant to

1  your investigation?

2  A    I learned that their son, Mr. Robert Scott Brown, Jr.,

3  had lived at the residence for several years, but had

4  recently moved out in the rough time frame of the end of

5  December.

6  Q    Was the timing of his move from the residence

7  significant to your investigation?

8  A    Yes.

9  Q    In what way?

10  A    So after December 2nd of 2021 I received no further

11  leads identifying the IP address at 3012 Deborah Drive of

12  attempting to download suspected CSAM files.

13  Q    Was this information, specifically the timing of the

14  last CSAM, made known to the other officials who were

15  assisting in the search warrant?

16  A    Yes, ma'am.

17  Q    Particularly Investigator Humphrey?

18  A    Yes, ma'am.

19  Q    Did you have an opportunity to interview Robert Scott

20  Brown, Jr.?

21  A    I did, yes, ma'am.

22  Q    Do you see him in the courtroom today?

23  A    Yes, ma'am.

24  Q    Can you identify him for the record?

25  A    Yes.  He is sitting at the defense counsel's table

1   behind his attorney.

2          MS. CASSIDY:  Your Honor, would the record reflect

3   that the witness has identified the defendant in open court?

4          THE COURT:  The record will reflect that.

5          MS. CASSIDY:  Thank you.

6   Q    (BY MS. CASSIDY) Who else was present during your

7   interview of the defendant?

8   A    There was another FBI agent, Special Agent Raquel

9   Mobley.  So really the interview was kind of broken up into

10  two phases.  The first phase was myself and Special Agent

11  Raquel Mobley, and then the second phase was myself,

12  Agent Mobley, and then Investigator Humphrey.

13  Q    Was the interview recorded?

14  A    It was, yes.

15  Q    During the interview process, I would say at the

16  beginning, did you advise the defendant of his Miranda

17  rights?

18  A    I did, yes, ma'am.

19  Q    Did the defendant tell you anything significant to your

20  investigation?

21  A    Yes.  He admitted to viewing pornography on a near

22  daily basis specifically in the genres of old, young, and

23  incest.  He told me that he had no idea what Freenet was and

24  he was not familiar with it, but he also confirmed that he

25  moved out the end of December of 2021.

1   Q    Did law enforcement that same day obtain a search

2   warrant for the defendant's new residence?

3   A    Yes.  We obtained a state search warrant.

4   Q    Where was Mr. Robert Brown, Senior -- sorry -- Junior

5   living at that time?

6   A    He was living approximately a mile or so down the road

7   at an apartment complex at 3100 Deborah Drive, apartment 61.

8   Q    And which law enforcement official obtained the state

9   search warrant?

10  A    Investigator James Humphrey.

11  Q    You previously testified that you spoke with

12  Investigator Humphrey about this investigation?

13  A    Yes, ma'am.

14  Q    And he was present during the interview of the

15  defendant?

16  A    Yes, ma'am.

17  Q    Was the search warrant executed that same day?

18  A    It was.  As soon as we concluded the execution of the

19  federal warrant at 3012 Deborah Drive.

20  Q    During the search of the defendant's apartment did

21  officials find anything of significance?

22  A    We did.  In Mr. Brown, Jr.'s bedroom, he had a computer

23  that was on and running Freenet.

24  Q    Did you also locate some hard drives?

25  A    I did, yes, ma'am.

1  Q     Was a search of those hard drives later conducted?

2  A     Yes.  Off-site.

3  Q     Was anything of significance located?

4  A     Yes.  We found hundreds, if not thousands, of items of

5  suspected child sexual abuse material, which included both

6  videos and images.

7  Q     Were they in any particular file on the hard drive?

8  A     Yes.  One particular file of interest to me was the

9  same file that Mr. Brown had requested back my original

10  lead, so that indicated that suspected file was successfully

11  downloaded onto Mr. Brown's machine.

12  Q     And were any of these files saved in a folder of

13  notable -- the name of which was notable to you?

14  A     Yes.  They were saved in the default location which was

15  the Freenet downloads folder.

16  Q     And my last question to you, Agent Scullin:  Prior to

17  the search warrant of the Deborah Drive residence, did you

18  ever conduct a search of the defendant's hard drive?

19  A     No, ma'am.

20  Q     The information you obtained, fair to say it was just

21  relayed to you as a user of Freenet?

22  A     Yes, ma'am.

23  Q     Thank you.

24         MS. CASSIDY:  I'll tender, Your Honor.

25         THE COURT:  Mr. Salomon.

1        MR. SALOMON:  Thank you.

2                    <u>CROSS-EXAMINATION</u>

3    BY MR. SALOMON:

4    Q    Agent Scullin, I'm Val Salomon.  I represent Mr. Brown.

5    I have a few questions.

6         First of all, you mentioned some surveillance.  When

7    did that occur?

8    A    The physical surveillance was -- I don't remember the

9    specific date, but it was -- it was around the time or just

10   prior to the execution of the federal warrant.

11   Q    Yet you weren't aware that Mr. Brown wasn't living at

12   that address on Deborah Drive?

13   A    From the physical surveillance, we were unable to

14   determine that.

15   Q    Now, you mentioned that the last CSAM was when?

16   A    December 2nd, 2021.

17   Q    And that was from an IP address located at what?

18   3012 Deborah Drive?

19   A    That's correct, yes, sir.

20   Q    Now, the search warrant that you mentioned where you

21   found the younger Mr. Brown, the computers and these

22   materials, was that at 3012 Deborah Drive?

23   A    No.  That was on the fall on second search warrant

24   executed on Mr. Brown, Jr.'s residence at 3100 Deborah

25   Drive.

```
1   Q     Apartment 61?

2   A     Yes, sir.

3   Q     Okay.  And I notice that the materials that I received

4   from the government that you had a rather -- rather lengthy

5   search warrant that you compiled and submitted to the

6   federal magistrate for review and signature that dealt with

7   the 3012 Deborah Drive.

8   A     Correct, yes, sir.

9   Q     Do you remember about how many pages that item was?

10  A     My actual affidavit?

11  Q     Yeah.

12  A     I don't remember how many.

13  Q     It was lengthy though?

14  A     It was lengthy, yes, sir.

15  Q     And detailed?

16  A     Yes.

17  Q     Okay.  Did you -- did you compile a similar warrant for

18  the apartment, the 3100 Deborah Drive?

19  A     I did not, no.

20  Q     Did you compile the warrant that was ultimately

21  utilized to search that particular apartment?

22  A     When you say "compiled," do you mean --

23  Q     Did you --

24  A     -- drafted?

25  Q     -- do the affidavit?
```

1   A    No.  I was not the affiant.

2   Q    It's my understanding from your testimony then that

3   apparently Deputy Humphrey is the person that compiled that

4   affidavit for the second warrant?

5   A    Yes, sir.

6   Q    And the first warrant that you compiled and that was

7   executed on 3012 Deborah Drive turned up zero; is that

8   correct?

9   A    Correct.  We found no evidence of child sexual abuse

10  material at that residence.

11  Q    Thank you.

12          MR. SALOMON:  I think that's all I have.

13          MS. CASSIDY:  Brief redirect, Your Honor?

14          THE COURT:  Okay.

15          MS. CASSIDY:  Thank you.

16                  REDIRECT EXAMINATION

17  BY MS. CASSIDY:

18  Q    Agent Scullin, I have in front of me Government

19  Exhibit 5 which is your affidavit and your search warrant.

20          MS. CASSIDY:  May I approach, Your Honor?

21          THE COURT:  Yes.

22          THE WITNESS:  Thank you, ma'am.

23          MS. CASSIDY:  Thank you.

24  Q    (BY MS. CASSIDY) Agent Scullin, would you just look

25  through that momentarily and just familiarize yourself with

1    the information that you put in the affidavit?

2    A    Absolutely.

3    Q    As you go through that, is it fair to say that a lot of

4    your affidavit is explaining how law enforcement came to

5    identify this IP address as a Freenet user?

6    A    Yes, ma'am.

7         MS. CASSIDY:  Nothing further, Your Honor.

8    Thank you.

9         THE COURT:  Okay.  Thank you.

10         (Off the record.)

11         THE COURT:  In case you want to recall him, you're

12    going to ask him to step out?

13         MS. CASSIDY:  Yes.

14         THE COURT:  I wanted to make sure we had that on

15    the record.

16         MS. CASSIDY:  Yes.

17         THE COURT:  I know you guys talked about it,

18    but --

19         MS. CASSIDY:  Yes.  The defense counsel has made

20    me think I might.

21         THE COURT:  Just in case.

22         MS. CASSIDY:  Thank you.

23    And, lastly, Your Honor, the government would call

24    investigator James Humphrey.

25         THE COURT:  Okay.

1        (Witness sworn.)

2             SERGEANT JAMES HUMPHREY,

3  having been first duly sworn to testify the truth, the whole

4  truth, and nothing but the truth, testified as follows:

5              DIRECT EXAMINATION

6  BY MS. CASSIDY:

7  Q    Good morning.

8  A    Good morning.

9  Q    Would you state and spell your name for the record?

10  A    James Humphrey.  It's J-A-M-E-S.  Humphrey,

11  H-U-M-P-H-R-E-Y.

12  Q    How are you employed as evidenced by your uniform?

13  A    The Ouachita Parish Sheriff's Office.

14  Q    How long have you been with the sheriff's office?

15  A    Twenty-two years.

16  Q    Are you assigned to any particular division currently?

17  A    I recently took a promotion to a sergeant in the patrol

18  division.

19  Q    Prior to patrol, were you assigned to another division?

20  A    Yes.  I was in investigations division.

21  Q    Were you also a task force officer for a federal

22  agency?

23  A    Yes, ma'am.  For almost nine years.

24  Q    What agency was that?

25  A    The FBI.  The Federal Bureau of Investigation.

1  Q    Thank you.  As a task force officer as well as working

2  in investigations, what were some of your duties and

3  responsibilities?

4  A    During that time, it was investigating all child

5  sexual exploitation cases, online exploitation cases,

6  child pornography investigations.

7  Q    In addition to your nine years of on-the-job

8  experience, did you attend any courses or training with

9  regard to the investigation of internet crimes against

10  children?

11  A    Yes, ma'am.

12  Q    Giving a ballpark number, how many classes do you think

13  you attended?

14  A    Oh, dozens.  I couldn't tell you exact, because I was

15  also a member of the Louisiana Attorney General's Task

16  Force when they provided training as well.  So I was getting

17  training from the AG's Office and from the FBI.

18  Q    I'd like to direct your attention to February 1st of

19  2022.  Were you working with the task force at that time?

20  A    Yes, ma'am.

21  Q    Specifically the federal task force?

22  A    Yes, ma'am.  I'm sorry.

23  Q    Did you assist in the execution of a federal search

24  warrant at 3012 Deborah Drive in Monroe?

25  A    I did.

1  Q     What agency obtained the search warrant?

2  A     The Federal Bureau of Investigation.

3  Q     Who was the case agent?

4  A     Bill Scullin.

5  Q     Did you speak with Agent Scullin about the

6  investigation as it was occurring?

7  A     Yes, ma'am, I did.

8  Q     Based upon those conversations, what did you understand

9  this investigation was about?

10  A     Downloading CSAM, child sexual abuse material, via the

11  internet.

12  Q     And do you know specifically what program was used at

13  the time to download these images?

14  A     Yes, ma'am.  It was Freenet.

15  Q     Who was believed at that time to live at 3012

16  Deborah Drive?

17  A     Robert Brown, Sr.; his wife, Katherine; and their son,

18  Robert Brown, Jr.

19  Q     What was your role in the execution of the search

20  warrant?

21  A     So when the agents went to the home to execute the

22  search warrant, I was tasked with finding where Robert

23  Brown, Jr., was located.

24  Q     Did you find him?

25  A     I did.

1    Q    Where was he?

2    A    He was employed by the school board in the IT

3    department, and he was filling a ticket at a local middle

4    school.

5    Q    Did you go to the middle school?

6    A    I did.

7    Q    And you found him?

8    A    Yes, ma'am.

9    Q    At that point did he go with you back to the residence?

10   A    He did.

11   Q    Did you place him under arrest?

12   A    No, ma'am.

13   Q    Did you force him to go back to the residence?

14   A    No, ma'am.

15   Q    And I didn't ask you this earlier, but with regard to

16   your conversations with Agent Scullin, what was your

17   understanding of when these CSAM images had been downloaded?

18   A    In the fall of 2022.

19             THE COURT:  2022 or 2021?

20             THE WITNESS:  I'm sorry.  2021.

21   Q    (BY MS. CASSIDY) Once you arrived at the residence,

22   did you learn if agents had conducted any type of on-site

23   forensic review of the digital devices at the Deborah Drive

24   residence?

25   A    Yes, ma'am.

1  Q    Was any CSAM material located on the devices?

2  A    No, there was not.

3  Q    Are you aware if Robert and Katherine Brown were

4  present at the home?

5  A    Yes, ma'am.

6  Q    Is it your understanding that they were interviewed?

7  A    I think they were interviewed.  I was not there for

8  that portion of it.

9  Q    Did you learn what Robert and Katherine Brown told

10  agents during their interviews?

11  A    That their son had moved out recently.  He was living

12  in an apartment nearby.

13  Q    Did you participate in an interview of the defendant?

14  A    Portions of it, yes, ma'am.

15  Q    And I say the "defendant," do you recognize Robert

16  Scott Brown, Junior --

17  A    I do.

18  Q    -- in the courtroom today?

19  A    I do.

20  Q    What information was learned from the defendant during

21  that interview?

22  A    He denied that he downloaded CSAM or child sexual abuse

23  material and admitted to downloading -- I mean viewing other

24  types of pornography on a daily basis and that he had

25  recently moved out.

1    Q    Was there anything significant about the timing of the

2    defendant's move from the residence and the CSAM material?

3    A    Yes, ma'am.  Beyond the date -- when he moved out,

4    there were no more images viewed, being downloaded, from

5    that residence on Deborah Drive.

6    Q    And it was your understanding that he moved out

7    approximately when?

8    A    In December.

9    Q    After interviewing the defendant, what did you do next?

10   A    We secured a search warrant for his apartment and that

11   was executed as well.

12   Q    The search warrant that was obtained, were you the

13   affiant?

14   A    I was.

15   Q    Where were you when you wrote out that search warrant?

16   A    I was sitting in my vehicle in my truck on the laptop

17   that afternoon.

18   Q    Was there any type of urgency to obtain this warrant?

19   A    Yes, ma'am.

20   Q    Why?

21   A    For fear of destruction of the evidence.  That's the

22   main reason.

23   Q    You recently testified the defendant was not under

24   arrest?

25   A    Correct.

1   Q    Investigator Humphrey, do you recognize -- I'm sorry,

2   now Sergeant Humphrey -- do you recognize this document?

3   A    Yes, ma'am.

4   Q    What is it?

5   A    It's my oath in support of search warrant.

6           MS. CASSIDY:  Your Honor, at this time the

7   government would move into evidence Government Exhibit 6.

8           MR. SALOMON:  No objection, Your Honor.

9           THE COURT:  Exhibit 6 is received into evidence.

10          MS. CASSIDY:  Mr. Goodwin, if you would scroll

11  down so that the probable cause section is available.

12          Thank you.  Just right here.

13  Q    (BY MS. CASSIDY) Agent Humphrey, I want to specifically

14  note the section that I've just bracketed in red.  Would you

15  just read that into the record, please?

16  A    "The investigation and probable cause revolved around

17  person(s) at the residence who were viewing images related

18  to CSAM (child sexual abuse material) over the course of the

19  last few months of 2021."

20  Q    And would you expound upon that, based upon your

21  earlier testimony?  When we're talking about the last few

22  months of 2021, what was your understanding of when these

23  CSAMs were viewed?

24          MR. SALOMON:  Judge, I object.  I believe that we

25  should be within the four corners of the affidavit.

1    THE COURT:  Let me get you to do this, first of

2  all.

3    MS. CASSIDY:  Oh, sorry.

4    THE COURT:  Step up --

5    MR. SALOMON:  I'm sorry, Judge.

6    THE COURT:  -- the microphone.

7    MR. SALOMON:  My objection is that we should be

8  bound by the four corners of the affidavit.  Not extraneous

9  material that he may have learned before, after, or the

10  weeks past.

11    MS. CASSIDY:  Your Honor, I believe he has

12  testified to information that he learned this before

13  otherwise he couldn't have made it in the affidavit, but

14  also with the good faith exception, we look outside the

15  affidavit.

16    THE COURT:  I understand the legal argument,

17  Mr. Salomon, and I certainly will apply the law, but I do

18  want to hear the information as it relates to the good faith

19  exception, so the objection --

20    MR. SALOMON:  Note my objection.

21    THE COURT:  I am going to note your objection for

22  the record.

23    MS. CASSIDY:  Thank you, Your Honor.

24    THE COURT:  You may proceed.

25  Q    (BY MS. CASSIDY) And, Sergeant Humphrey, I apologize,

1    if you would just speak a little bit to the course of the

2    last few months of 2021.

3    A    So in -- I want to say it was in November, I was aware

4    that there was a target in the Monroe area.  I did not have

5    a lot of involvement in any of the investigation of that

6    target, but that, hey, there is going to be a search

7    warrant, you know.  We got an investigation open.  It's in

8    Monroe.  And we're going to be -- we're going to be working

9    it.  It's assigned to Agent Scullin, who was in the

10   Shreveport office, and to kind of be aware, it's coming.

11   And, like I said, that was in October, November.

12   Q    And as it relates to October, November, did you and

13   Agent Scullin specifically discuss when these images were

14   being downloaded?

15   A    Not the specific dates.  Just the times.

16   Q    And, I'm sorry, when we're talking about -- I don't

17   mean to pin you to a date, but just general parts of the

18   year.

19   A    Yes.

20   Q    And what was that?

21   A    The fall of 2021.

22   Q    And then the last part that I bracketed in your

23   affidavit, it says no evidence that criminal activity was

24   found at 3012 Deborah Drive where just the mother and father

25   reside and evidence also shows that there was no additional

1  CSAM activity beyond the date Robert Junior moved from the

2  residence.  How did you know that there had been no

3  additional CSAM recovered or downloaded?

4  A    Agent Scullin checked.

5  Q    Thank you.

6          MS. CASSIDY:  I'll tender, Your Honor.

7          THE COURT:  Mr. Salomon.

8          MR. SALOMON:  I'm sorry.  Is the -- without

9  scrolling, is the warrant itself, the search warrant itself

10  in here --

11         MS. CASSIDY:  Yes.

12         MR. SALOMON:  -- or just the other one?

13         MS. CASSIDY:  It's here, but if you want the

14  (inaudible).

15         MR. SALOMON:  No, no.  I got a copy of it.  I'm

16  just making sure, so --

17                    CROSS-EXAMINATION

18  BY MR. SALOMON:

19  Q    Sergeant Humphrey, if I can back up.  It's my

20  understanding you were not there for the interview with

21  Robert Senior and his wife Katherine?

22  A    Correct.

23  Q    You mentioned some information that you had and a

24  number of -- you know, much information that you perhaps had

25  learned as part of the investigation from the FBI.

1    A    Yes, sir.

2    Q    But in looking at the oath, it's not included in the

3    oath, is it?

4    A    So it's included in the oath about we were there to

5    execute a search warrant that had been obtained by the FBI

6    and it was registered to persons at that residence --

7    Q    But any of the --

8         (Simultaneous crosstalk.)

9    A    -- CSAM.

10   Q    But any of the information regarding with the

11   investigation, in the course of the investigation, it's not

12   within the four corners of your affidavit, is it?

13   A    Yes, sir, it is.

14   Q    Oh, it is.  Okay.  Well, I have another question,

15   though, while I'm thinking about it.

16        MR. SALOMON:  Can we pull up the actual search

17   warrant for the property?  That's fine.  You can stop right

18   there.

19   Q    (BY MR. SALOMON) Can you see that?  Where it says

20   "you are hereby ordered"?

21   A    Yes.

22   Q    Why did you want to search 304 Medorah Drive?

23   A    That appears to be an error on my part.

24   Q    Okay.  Was this some sort of standard language that you

25   appropriated from some other warrant and stuck it in there

1    and that's where that came from?

2    A    No.  Some of the information from what we were looking

3    for is -- would be deemed boilerplate, but the probable

4    cause is not.

5    Q    Okay.  But --

6    A    And just above it in the -- in the dark, where it says

7    the specific address, no, it was an oversight.

8    Q    And going back to your affidavit itself, in support of

9    the search warrant, there are a number of pages talking

10   about your past investigations and what you're -- you know,

11   and things you would expect to find, those were all

12   boilerplate also?

13   A    Are you talking about my -- I guess, just clarify the

14   question.  You're talking about my previous experiences?

15   Q    No, no.  I'm talking about the information within your

16   oath in support of the search warrant, there are some --

17   you know, several pages dealing with past investigation and

18   past -- past knowledge why you would expect to find certain

19   things based upon your experience, but that's boilerplate

20   language, too, also, correct?

21   A    As far as my past experience, I'd have to speak to

22   that of --

23           MR. SALOMON:  Let's go back to the oath in support

24   of the search warrant.  If we can scroll back to that,

25   please.  Okay.  Now, if we can scroll up a little bit,

1    please.

2            MS. CASSIDY:  Oh, we'll have to do it.

3            MR. SALOMON:  Yeah, scroll up a little bit,

4    please.  Let's -- so I can see the probable cause part.

5    Q    (BY MR. SALOMON) I noticed right here we have, you

6    know, what appears to be information concerning this

7    particular search, and then after "Your affiant knows..."

8    computer hardware, software and data...instrumentalities,"

9    that's all boilerplate, though, isn't it?  That's not

10   something you compose just for this instance, is it?

11   A    Where are you talking about?

12   Q    The paragraph, again, in your --

13   A    "Your affiant knows that" --

14   Q    Yeah.

15   A    -- "computer hardware, software and data"?

16   Q    Yeah.  Right there.

17   A    Yeah, it is all accurate information.

18   Q    I understand that.  I asked you if it's boilerplate.

19   A    Yes.

20   Q    Okay.  And as are the following paragraphs?

21   A    We'd have to scroll through.

22   Q    Well, go ahead --

23   A    Some of them --

24   Q    -- and scroll through it.

25   A    Some of them are on --

1    Q    We got plenty of time.

2    A    Some of those are specific to that address.

3    Q    Well, is there something that you added beyond this

4    that wasn't boilerplate?

5    A    On this section?

6    Q    Yes, sir.

7    A    I'd have to read through it.

8    Q    Take your time.

9            MS. CASSIDY:  Mr. Salomon, give him a hard copy.

10           (Off the record.)

11           MR. SALOMON:  We're going to give him a hard copy.

12           MS. CASSIDY:  Is that all right, Your Honor?

13    May I approach?

14           THE COURT:  Yes.  My understanding is Ms. Cassidy

15    is going to approach and provide a hard copy of that search

16    warrant to the witness.

17           THE WITNESS:  So on page 2, where it's numbered

18    1 and 2, "A search warrant return will be filed," that's the

19    specific address of where we are -- what we're searching.

20    Q    (BY MR. SALOMON) I'm sorry?  I couldn't understand.

21    A    Page 2 about three-quarters of the way down --

22    Q    Yeah.  You're talking about some address and --

23    A    Correct.

24    Q    -- that the other --

25    A    That's the difference.

1    Q    -- warrant turned up nothing.

2    A    It's speaking strictly to the oath.  That's it.

3    Q    So everything else is boilerplate?

4    A    Yes.

5    Q    And this -- was there some other oath in support or is

6    this the sole oath that -- information that you presented to

7    the magistrate, the judge?

8    A    That is the oath.

9            MR. SALOMON:  Thank you.

10           MS. CASSIDY:  May I redirect, Your Honor?

11           THE COURT:  Yes.

12                    REDIRECT EXAMINATION

13   BY MS. CASSIDY:

14   Q    Investigator Humphrey, defense counsel, if you'll

15   recall, was asking you about information in your affidavit

16   that was boilerplate in your oath.

17   A    Yes, ma'am.

18   Q    How long did you say you have been working in internet

19   crimes against children?

20   A    Nine years.

21   Q    As part of your experience, have you come to learn that

22   certain crimes might always be used by certain devices?

23   A    Yes, ma'am.

24   Q    Can you elaborate a little bit about that as it relates

25   to internet crimes against children?

1   A     So persons specifically download, view, and share child
2   pornography.  I am used to using the term "child
3   pornography."  CSAM is a newer term in these investigations.
4   So I apologize that I -- I usually say "child pornography."
5   But child pornography persons, when they -- to say that
6   they're all the same would be incorrect.  To say they're all
7   different is incorrect.  They all possess and hold these
8   items near and dear to them because that is their collection
9   of child pornography.  And so if you -- but they're all
10  using electronic equipment.  Some may use a dial-up mode.
11  Some may use high-speed internet.  Some may use a hard drive
12  to store it.  Some may use their phone to store it.  So in
13  order -- when we do these investigations, you may not know
14  which ones are which, so you want to make sure that you are
15  covered on what you're searching.  You're searching for all
16  electronics and that's why.
17  Q     And so you know that these crimes are being committed
18  with electronic devices?
19  A     Yes, ma'am.
20  Q     So is it fair to say that your search is to look for
21  all electronic devices?
22  A     Yes, ma'am.
23  Q     And is that going to be the case in -- I don't want to
24  say "all," but most of your crimes that you're investigating
25  involving internet crimes against children?

1    A    Say that again.  I'm sorry.

2    Q    Is that going to be the case in most of your

3    investigations for internet crimes?

4    A    Yes, ma'am.  When I first started, we were -- most

5    everybody that we dealt with had a tower lap -- tower

6    computer on a desk.  We started moving into laptops.  And

7    then there towards the end, they may use cell phones.  But,

8    like I said, not all are the same, but there are very few

9    differences in them as well.

10   Q    So when defense counsel asked you if this information

11   was boilerplate, is it better to say that this information

12   is standard?

13   A    Yes, ma'am.

14   Q    Thank you.

15            MS. CASSIDY:  Thank you, Your Honor.

16            THE COURT:  May the witness step down?

17            MS. CASSIDY:  Yes, Your Honor.  I apologize.

18            THE COURT:  Thank you.  And is that the last

19   witness for the government?

20            MS. CASSIDY:  Yes, Your Honor.

21            THE COURT:  Okay.  And does the defendant -- do

22   you guys have any witnesses?

23            MR. SALOMON:  No, ma'am.

24            THE COURT:  Okay.  Then it seems to me we can move

25   to argument.

1    MR. SALOMON:  Thank you.  Your Honor, I had a

2  three-part argument.  One I may dispense with that deals

3  with my understanding of how the agency acquired the CSAM

4  information from the warrant -- for the bare bones of the

5  warrant was unclear of how it was developed.  Did not -- he

6  was not aware one way or the other from again the warrant,

7  whether it was downloaded or something from Google or some

8  internet provider that alerted the -- alerted the NC, the

9  national comprehensive, you know, warehousing of the stuff,

10  who, in turn, notifies the police, and that warehousing

11  having been a government agency.  But that was not the case

12  here.  In this instance, it was a software program that

13  simply alerts them whenever -- whenever on this public sites

14  it runs, so that part, apparently, I will abandon.

15    THE COURT:  Okay.  So I want to make sure that

16  we're on the same page, Mr. Salomon.  You're abandoning the

17  argument about the review of the Freenet data being an

18  unreasonable search and seizure?

19    MR. SALOMON:  Yes.

20    THE COURT:  Okay.

21    MR. SALOMON:  Yes.  Since it's accessed publicly,

22  simply via software, that there is nothing unusual about it

23  that you and I can access.

24    THE COURT:  Okay.  So we're --

25    MR. SALOMON:  So when I'm doing with --

1    THE COURT:  So that I understand your argument on
2    the bare bones of the --
3    MR. SALOMON:  Bare bones, yeah.
4    THE COURT:  -- affidavit and the -- are you still
5    proceeding on the staleness?
6    MR. SALOMON:  Yes.
7    THE COURT:  Okay.
8    MR. SALOMON:  Yes.  It's part and parcel.
9    We have one, sort of, long run-on paragraph here
10   detailing the probable cause specific to this particular
11   incident in this particular -- and it recites there was a
12   search at 3012 Deborah Drive which resulted in nothing.
13   There is a mention that over the course of the last three --
14   few months of 2021, there was some CSAM material that's
15   associated with that address, but there is nothing in here
16   indicating any CSAM evidence being associated with the
17   3100 Deborah Drive, apartment 61, address.  There is nothing
18   in here about exactly who accessed this -- these materials
19   at 3012 Deborah Drive.  There is no information contained
20   within here when or how it was accessed.  There is no
21   information about -- of any particularity about when
22   Robert Junior moved and when that might have been in
23   relation to any materials that were found through this
24   algorithm.  Of course, the algorithm itself is not mentioned
25   in any form or fashion.  There is no information in here

1  about how this access to any CSAM information was acquired,

2  from whom, and why there is any connection to this

3  particular address and apartment other than Robert Brown

4  happening to live there, since there is nothing that

5  associates him with any misconduct whatsoever.  He indicated

6  he watches porn.  Well, I don't think that's exactly an

7  exclusive club in the United States, you know, since I

8  believe, you know, millions of people access it.

9         And there is nothing -- there is no admission of

10  anything untoward on his behalf or any misconduct.  And, as

11  it says, there is no additional CSAM activity, you know, on

12  some -- some unspecified date, perhaps in December, perhaps

13  not.

14         As to the staleness argument, there is no specifics and

15  no particularity within the affidavit indicating when any --

16  you know, specifics as to when any of this activity

17  occurred.  Obviously, it was all available.  There is an

18  earlier warrant by Agent Scullin which was quite detailed

19  and -- but this was not supplied to the issuing judge

20  magistrate, this particular entrance -- incidence.  It was

21  not incorporated in any form or fashion.  And it was at all

22  times available.  Hard to argue good faith when you have the

23  information and you don't supply it, when you ignore it,

24  intentionally, unintentionally, casually, or how it may have

25  come about.

1        And, of course, I'd also note that, for some reason,

2    we're searching a different address on Medorah Drive, once

3    again, utilizing boilerplate and I'm sure that's where that

4    came from.  Thank you.

5               THE COURT:  Ms. Cassidy.

6               MS. CASSIDY:  Yes.  Thank you, Your Honor.

7        I did want to briefly address a few of Mr. Salomon's

8    arguments.  Obviously, the government disagrees this is

9    bare bones, but that's the point of having the defense and

10   the government.

11              THE COURT:  And that's what I'll rule on.

12              MS. CASSIDY:  But, Your Honor, Mr. Salomon notes

13   that Agent Scullin's search warrant was very detailed.

14   The difference is Agent Scullin had the benefit of time to

15   prepare that search warrant.  Investigator and now Sergeant

16   Humphrey testified he prepared it in his truck on-site.

17   There was a sense of urgency, because we have a man who is

18   not under arrest, who had access to the home and who could

19   destroy evidence within the apartment.  So I don't think

20   it's fair for the defense to suggest that, "Well, Agent

21   Scullin's affidavit was more detailed.  His should have

22   been, too."

23       But even beyond that, Mr. Salomon suggests that there

24   is no information -- and, hopefully, I wrote it down

25   correctly.  I don't want to misquote him.  But there is no

1    information about who or how the CSAM was viewed at 3012

2    Deborah Drive.  Well, that's exactly the point.  That was

3    the point of the search warrant.  We don't know who inside

4    the home was viewing it.  That's why we obtained the search

5    warrant, to go search the house, find the electronic

6    devices, hope to find some type of characteristics about

7    that device that would link us to the viewer of a time when

8    three people were living inside the home.  So I would

9    completely agree with Mr. Salomon, that there is not that

10   information here, because we don't know it, at the time.

11        What we do know, what is included in this affidavit,

12   is we know that Robert Brown, Jr., was originally living at

13   this home.  And we know that over the last few months of

14   2021, there had been CSAM material being downloaded to this

15   home.

16        We also know that Mr. Brown moved from the home, and

17   after that, based upon this warrant, the CSAM stopped.  I

18   think this is more than sufficient to say there is a link

19   here between Mr. Brown exiting the home and the CSAM

20   material stopping.

21        This affidavit, the oath, identifies the search

22   warrant, as does the warrant itself.  There is a reference

23   to a Medorah Drive address, but agents didn't search

24   Medorah Drive.  They searched 3100 Deborah Drive,

25   apartment 61.  And I did want to make one other argument,

1    Your Honor.  I just have to remember what it was.

2                THE COURT:  Did you want to address staleness?

3                MS. CASSIDY:  Oh, Your Honor, I apologize.  I did

4    want to address just very briefly, on the staleness issue.

5    I cited this in my brief, but the Fifth Circuit held about a

6    six-month delay between the discovery of child pornography

7    and the application of a search warrant doesn't render the

8    warrant stale, and the government argues that's particularly

9    because of technology.  Technology, as Sergeant Humphrey

10   described, these devices are meant to maintain it.  And it's

11   not unreasonable to believe that when Robert Brown, Jr.,

12   left the home, that he would have taken his devices with him

13   to his new location.  And the nature of these types of

14   crimes involve retaining child pornography, making a

15   collection.  And so it was not unreasonable for these agents

16   and it was not unreasonable, according to the Fifth Circuit,

17   to have a search warrant that's executed after the last few

18   months that the CSAM was viewed.

19       Your Honor, I think that addresses everything.  If

20   there is something else the Court would like us to speak on.

21               MR. SALOMON:  I have a brief response, Your Honor,

22   if I might.

23               THE COURT:  Okay.

24               MR. SALOMON:  Looking, once again, at the four

25   corners of the affidavit, there is no indicia -- there is

1  nothing indicating that there was a computer in this

2  apartment at apartment number 61.  There is no computer

3  activity that was noted by anyone that concerns this

4  apartment.  What the warrant says is that they had a search

5  warrant that showed activity at the Deborah Drive address of

6  the parents, that they didn't find anything there, although

7  computers, and then it says, well, we've got a son who

8  watches porn.  We're going to go search this other place.

9  It doesn't indicate that there are any computers, any

10  computer activity, any CSAM activity, since he moved, even

11  though they're not specific as to when he moved.  I know the

12  government indicates that they were in a rush, but not in a

13  rush enough to ask any questions and providing information

14  in this particular instance.  I don't think a rush makes it

15  good faith.

16         THE COURT:  All right.  Thank you both very much.

17  I appreciate all the testimony from the witnesses.  I will

18  take the motion under advisement on the remaining two issues

19  and we will issue a report and recommendation shortly.

20  Thank you all very much.  We are adjourned.

21      (Proceedings concluded at 2:59 p.m.)

22                        CERTIFICATE

23  I hereby certify that the foregoing is a true and correct
    transcript from the record of proceedings in the
24  above-entitled matter.    /s/ Diana Cavenah
                              Official Court Reporter
25